Robertson, J.
—This action is brought by the plaintiffs, a corporation of the State of Ohio, to recover the value of certain drafts owned by them, which they claim to have been transferred to the defendants as security for a usurious loan, alleged to have been made to the Ohio Life Insurance *550 and Trust Company; to whose cashier they were sent by the plaintiffs for collection.
The ownership of the drafts by the plaintiffs, their transmission of them to the cashier of the Life and Trust Company "for collection, and his borrowing money upon them, fully appear in evidence. No appropriation of the funds received by him, for the benefit of such company, or authority from them to use such drafts as security for any loan of money, is proved in the case; unless it must be inferred, from the ‘fact of'his being cashier, or his declaration that'he borrowed such funds for their use.
On the trial, a question was put to one of the defendants, in order to prove the usurious character of the loan, which is as follows:
“Q. "Were not the loans made by William Hoge & Co. to the Ohio Life and Trust Company through Mr. Ludlow, and to secure which it is claimed that the four acceptances are held by the defendants, made under an agreement by which Hoge & Co. reserved to be paid to them, and by which the Ohio Life and Trust Company agreed to pay to them, interest at and after a greater rate than at the rate of seven per cent, per annum, to wit, interest at the rate of fourteen per cent, per annum ?”
(To this question the defendants’ counsel objected. The court sustained the objection, and the plaintiffs’ counsel excepted.)
The validity of this exception is to be governed by the construction to be put upon the statute of 1850, prohibiting corporations from setting up the defence-of usury. (Ses. Laws, 1850, ch. 112.) If the plaintiffs are debarred thereby from setting up usury in the loan, for which their property was pledged without their consent; then such exception was not well taken; and that depends upon the question, whether the statute was intended to create merely a disability in corporations to plead usury as a defence, or to legalize usurious contracts made by them. If the purpose of the statute be to create a mere exception to general laws against usury, the form of expression *551 adopted in it to accomplish that purpose is extraordinary; none parallel to it can be'found in any statute having such a purpose. Contracts where a corporation reserves usury are clearly not within it; as it speaks only of a defence. It does not affect the contract, but only the remedy; otherwise, it would render it valid in other countries or states, which it does not. (Hungerford Bank v. Potsdam and Wat. Railroad Co., 10 Abb. 24.) It does affect contracts made abroad and foreign corporations; Southern Life Ins. and Trust Co. v. Packer, (17 N. Y. R. 52) ; and applies to those made before its passage as well as since. (Curtis v. Leavitt, 15 N. Y. R. 85.) None of those results would follow from merely excepting loans to corporations from the effect of the statutes against usury.
One mode sometimes employed to get at the meaning of a statute is, to ascertain the evil and the remedy. In this case, we know from history the evil consisted in corporations rendering complicated transactions in the transfer of securities and bills of exchange a mode of setting aside contracts for usury unthought of in their formation; and a notorious case, then recently decided in the Court of Appeals, had awakened universal indignation. The prohibition was created, extending just far enough to prevent such artificial bodies from availing themselves of any plea of extortion; but it did not intend to encourage the practice of taking usury, or place those who had taken, or would take it from a corporation, in any better condition than others, except as regarded the borrowing corporation. Still less did it intend to allow the usury laws to.be evaded by permitting contracts to be made nominally with corporations, while the real borrowers became nominal sureties, with a secret understanding between them and the corporations. Such a license would have opened a new field for enterprise to such corporations as would undertake to make usurious contracts for borrowers for a per centage, while the latter would be the party really looked to; thus adding to the sacrifices made by needy borrowers in order to raise money. In such case, a prohibition to plead usury would *552 be a privilege instead of an injury; as was shown by applications made to- the Legislature to confer the same on private individuals.
It is plain, therefore, that in regard to all others but the borrowing corporation itself, the prior statutes could only be maintained by confining the restriction to the corporation itself, and allowing all others, who might be parties to a usurious loan to a corporation, to avail themselves of the objection of usury. Such has been the decision of every court to whom the question has been heretofore submitted. The -first case which came before a court, in regard to the interpretation of this statute, was that of Bock v. Lauman, in Pennsylvania (24 Penn. 435), where the defendant had indorsed certain acceptances of a New York corporation, but was held to be a joint contractor. In that case, it was decided that the prohibition did not affect the defendant, or any other parties to a contract but the corporation. This was followed by the case of The Market Bank of Troy v. Smith, in Wisconsin, in the United States District Court, where a similar principle was adopted (Am. L. Reg. for September, 1859); and it was fully analyzed and fixed in this State, in the case of Hungerford Bank v. Potsdam and Wat. Railroad Co., before referred to. In that case, it was held that the accommodation indorser of a draft of a corporation, usuriously discounted, could set up the usury as a defence to his liability. The decision was expressly put upon the ground that the prohibition of the' statute of 1850 extended only to the corporation, and did not make the contract with others, as sureties, good. The whole force of the reasoning in that case was directed to the question, whether the fact of a contract being made with a corporation, although tainted with usury, made it, in all its remote or secondary consequences, and its operation on the rights of others, valid to all intents and purposes.
There can be no doubt, under the decisions last-cited, if the plaintiffs had been sureties for the loan to the Ohio Life Insurance and Trust Company, they could success *553 fully have evaded any liability; or that if they had delivered their own note, or transferred property belonging to them as security for the loan, they could have recovered them back; but is contended that having trusted their choses in action in the hands of an officer of a corporation solely to collect them, and without an authority to employ them for any other purpose, if he represent them to be the property of such corporation, and obtain usurious advances upon them, the plaintiffs cannot reclaim them. This would be an extraordinary anomaly, if produced by the statute. Is it possible that a law has been deliberately passed in such a form as to bring about the result, that parties who Icnowingly and voluntarily pledge their responsibility and their property,, for the performance of a contract, may evade the responsibility, and reclaim the property, but if it is done by one who is an agent, for other purposes only, without authority for such purpose, they cannot ? Hastily as legislation is sometimes conducted, it is very rare to see it so stultify itself; and there is no room for supposing it has done so in this case ; such a consequence would make the validity of a contract depend on the representation of the agent, or rather upon the fact that the contract was made by an agent; for the possession of the notes, properly indorsed, was prima facie a representation of ownership.
The fallacy in the reasoning, which leads to so anomalous a result, is that which assumes that the main contract, with all its ramifications and auxiliary obligations, must be entirely void, or entirely valid, as to all the parties to be affected by it; all contracts made with two parties, one of whom is under a personal disability, may be void as to him, and good as to the others. A covenantor to pay a usurious -loan may set up usury, although the purchaser of property pledged to secure such loan cannot; a contract by a corporation to pay a usurious loan may well be valid to the extent of their assets, that is, they can set up no defence against it, yet be invalid as against third parties and their property; the law has not declared such contract *554 to be innocent, but merely that it is innocent as regards the borrowing corporation and its property. It is.in vain to say that third parties have a right to assume that corporations are owners of property of which they are possessed, and that, therefore, a usurious loan on the faith of it is valid; for it begs the whole question. Concede that such contract is illegal as regards third parties, and it is as just to say that usurious lenders to corporations take securities which they get from them at the risk of their not being the property of the borrowers, and therefore improperly pledged to them, as to say they are entitled to hold them against the innocent owners. The statute does not so purge the contract of all vice as to make it entirely meritorious, but rather merely puts the lender and borrower on the same Tooting, making it illegal as to the rest of-the world. In the language of Judge Allen, in the case before cited of Hungerford v. The Potsdam, Railroad Company, “ It is only by a construction not warranted by the language of the act, or required by any necessity, or necessary to give full effect to the statute and the intention of the Legislature as expressed in it, that it can be claimed that a usurious loan to a corporation, and all securities connected with it, are made valid;” and if not valid as to a voluntary party to the contract, they clearly should not be as to a stranger whose property was _ attempted to be used without his consent to pay such loan. It might be contended, with as much if not more plausibility, that the plaintiffs could not avail themselves of the usury because they were a corporation, as the statute of 1850 does not specify by or to whom the usury mentioned in it is to be reserved, but prohibits corporations generally from setting up the defence of usury; but if the object of the statute can be inquired into for the purpose" of interpreting it as to the connection of the corporation with the usury, it may be equally examined to see how far it meant to rid a contract with a corporation of all the consequences of its being usurious. It certainly would have been much easier and more direct, if the Legislature had *555 intended it, to have excepted contracts with corporations from the operations of the usury law, and therein to have accomplished it by prohibiting corporations from setting up usury as a defence.
I am satisfied, therefore, that the plaintiffs were entitled to recover, if the question excepted to could only be truly answered in the affirmative. I consider the question of the notice which is to destroy lonafides in a purchase, as governed by the cases of Pringle v. Phillips, (5 Sandf. R. 157,) and Williamson v. Brown, (15 N. Y. R. 354;) but as the judge charged substantially according to the principles of those cases, and I consider the ground I have already stated sufficient, I do not consider it necessary to discuss the objection to the charge upon that point.
The judgment should therefore be reversed, and a new trial granted, with costs to abide the event.
Hoffman, J.
—1st. The first- important question under the first head is, what is the effect of the statute of usury, and the act of April 6th, 1850, ch. 172, upon-the case?
The point thus arises:
The acceptances in question being in the hands of the cashier of the Ohio Life Insurance and Trust Company, and being considered by the defendants to be the property of that company (a fact now assumed), were taken as collateral security for moneys loaned by them to such company.
One of the defendants being examined as a witness, this question is asked by the plaintiff: “Were not the loans made by William Hoge & Company (defendants) to the Ohio Life Insurance and Trust Company through Mr. Ludlow, and to secure which it is claimed that the four' acceptances are held by the defendants, made under an agreement, hy which Hoge & Company reserved to be paid to them, and by which the Ohio Life Insurance and Trust Company agreed to pay to them, interest at and after a greater rate than at the rate of seven per cent, per annum, to wit, at the rate of fourteen per cent, per annum ?”
*556 To this question the defendants’ counsel objected. The court sustained the objection, and the plaintiff’s counsel excepted.
The question between the parties being, whether the defendants took the acceptances as holders in good faith, without reason to doubt their being the property of the Ohio company, it is insisted that if they took usury upon the loan, they were not holders or purchasers in good faith, and did not acquire a title to the bills. It is not to be disputed, that if the question under the statute of usury is not so affected by the act of 1850 as to vary the result, the proposition of the plaintiff is sound law.
Ramsdell v. Morgan (16 Wend. 576), Keutgen v. Parks (2 Sandf. Sup. Ct. R. 60), and Bean v. Howell (Lalor’s Sup. to Hill, 39), are sufficient authorities for this point. The party guilty of usury in the transaction, by which he obtains property, is not a Iona fide purchaser, so as to hold it against the real owner.
The statute of 1850 enacts, “that no corporation shall hereafter interpose the defence of usury.” What is the import and extent of this provision?
• The first and obvious meaning is, that usury shall not be allowed as a means of defeating an action against the corporation, for the fulfillment of its engagement, or recovery of a demand, for which it is otherwise liable. The statute would have prevented the decision in the case of the Dry Dock Bank.
It has been, however, definitely settled, that it has a more comprehensive meaning. It extends to the prohibition of the corporation from bringing an action to recover securities deposited with a lender on a usurious loan.
In the Southern Life Insurance Co. v. Packer (17 N. Y. R. 51), a referee had given judgment for the surrender of securities in such a case, and payment of moneys collected upon them. The questions passed upon were, that the statute was retrospective; and that it applied to a foreign corporation. The application to the existing action was taken for granted, and judgment for the defendants was *557 sustained. (See, also, Butterworth v. O’Brien (7 Abbott, 456).
The result then, is, that contracts with corporations shall in nowise be vitiated or affected by reason of any taint of usury in them. When the Legislature prohibits every mode of setting up a defence, or asserting a demand, in a "given case, it effectually destroys the right which otherwise would exist. The statute is, in my view, equivalent to an enactment that no contracts or transactions with a corporation shall be void or impaired b„y reason of any excess of legal interest being taken, or agreed to be taken, upon them from such corporation.
It-follows, that the lender can recover his demand; and he can recover, because the contract or transaction is rendered valid. His right to support an action rests upon the ground that the loan, which before was void as usurious, is now legal and free from the objection. And it then seems incomprehensible how he can be treated as continuing liable, criminally, for a misdemeanor upon a transaction which is so entirely rendered lawful, that he can recover upon it, and sustain it, civilly, in every respect, as if there had never been a statute of usury.
It is this train of thought which leads me to conclude, that the observations of some of the learned justices in the Court of Appeals are not to be treated as mere passing and needless expressions; but that, whether meditated upon and matured or not, they are accurate and sound. Pratt, Justice, in the case of Southern Life Ins. Co. v. Packer (ut supra), and'Comstock, Justice, in Curtis v. Leavitt (15 N. Y. R. 9-85),.speak of the act as a partial repeal of the usury laws ; and a repeal as to corporations.
It is needless to inquire what would be the case, if a corporation were a lender upon usury — not a borrower.
It is, then, clear, that the present defendants could have supported an action against the Ohio company for the loan upon which the acceptances were deposited. As between those parties, the case is precisely as if there had never been a statute of usury. The transaction, interpreted by *558 the statute, is this: It was lawful for - the company to give, and the defendants to receive, fourteen dollar's upon every hundred dollars for the use of the money during a year. It is not easily comprehended how this legitimate contract between these original parties can leave it open to parties on collateral paper deposited, without any privity with the transaction, to assert usury in it. It seems to me to make the defendants holders and purchasers in good faith, so far as this question is concerned.
The language of Justice Hogeboom, in the case of Butterworth v. O'Brien (16 Howard, 503, 7 Abbott, 456), at general term, coincides with the views now taken. The statute, by prohibiting the defence, has removed the taint of usury. It is no longer, as to corporations, illegal. It has become a lawful and proper transaction. When the Hungerford Bank v. The Potsdam and Wat. Railroad Co. was before Mr. Justice Mason, at special term (9 Abbott, 124), he held that, under the act of 1850, the contracts of corporations were no longer invalidated by usury; and that' an accommodation indorser for a corporation, upon a usurious note, could not set up the defence to invalidate his contract.
The case was appealed to the general term (10 Abbott, 24, 19 How. 39), and the decision reversed.
After a careful consideration of the full and able argument of Mr. Justice Allen in that case, I may confidently say that entire concurrence may be given to its material propositions, (with, perhaps, one exception,) as well as to the decision, without varying the rfesult I have reached in the present instance.
The individual defendants were, as before stated, accommodation indorsers. The learned judge says: “ They were in no sense strangers to the contract of loan. They were sureties of the borrower, and as such were embraced in the term ‘borrower,’ as used in the eighth section of the Revised Statutes relating to usury, and in the fourth section of the Usury Laws of 1837. A mere stranger to the transaction cannot ordinarily allege usury in respect *559 to it. The defendants were not strangers to their own contract of indorsement. They are not necessarily restricted by their relation to the principal to the defences which may be made available to the maker .of the note.
“It is as to the contract of the corporation that the Statute of Usury is quasi repealed, not as to the individual indorser. It is only by a construction not warranted by the language of the act, nor required by any necessity, nor necessary to give full effect to the statute and the intent of the Legislature as expressed in it, that it can be claimed that the loan to a corporation, and all securities connected with it, are made valid by being taken out of the operation of the Statute of Usury by the act of 1850, and I am not prepared to go that length.”
The only expressions in this opinion, which might be interpreted as inconsistent with the views I have expressed, are those that I have italicized. They must be construed in connection with the case considered. And then it seems clear that the question of the right of an accommodation indorser of a corporation’s note, on a usurious consideration, is widely different from the question whether a transferee of collateral securities takes them in good faith, when he takes them to secure a- loan made in legal good faith.
Reference is made by counsel to the case of Bock v. Lauman (24 Penn. R. 435). In commenting on the statute of 1850, the court say: “It certainly does make contracts by corporations to give more than seven per cent, interest valid, and we suppose that it makes them entirely lawful as well for the lender as for the borrower. Here, however, the contract really is made with the corporation and the defendants as its sureties; and with the latter no valid contract can be made for more than seven per cent, interest. The indorser is so far a party to the transaction that he may object to it for usury.” (11 Wend. 329; 9 Paige, 297.)
The reasons for the decision in Gaither v. The Farmers’ and Mechanics’ Bank of Georgetown, (1 Peters’ U. S. R. 37,) *560 and Harrison v. Hannell, (5 Taunton, 180,) there cited, appear to sustain these conclusions. “Gaither does not,” says the learned judge, in the first case, “propose, by this defence, to relieve himself from paying the note; it goes only to his liability to pay it to this individual. The indorsement of a promissory note creates several contracts ; and if, in this case, it could give a right of action against Gaither, the drawer, it ought also to sustain an action against Corcoran & Co., the indorsers; but against them it is perfectly clear an action could not be sustained, for they were parties to the usurious loan. It follows that their indorsement was a void act, and the property, and of consequence the right of action, never passed to these plaintiffs.”
So in the case from 5th Taunton the valid collateral bond was held void, “not because it was given for securing usurious interest, but because it was given for enforcing a-contract fo.r usurious interest.”
These cases show that the principle is this—that the collateral security follows and abides by the law, which attaches to the principal obligation.
I am of opinion that the ruling of the court below was in this particular correct.
The next point made under the head of the erroneous exclusion of evidence is, the rejection of testimony that the Ohio Company had been for a long time a needy borrower, raising money on good collaterals at exorbitant rates of interest.
This exception was not much pressed. We think it clearly untenable.
2d. The counsel of the plaintiffs insists that the jury should have been directed to find a verdict for the plaintiffs.
We do not see on what ground this could be claimed, unless under the first division of the fourth point — that the Trust Company, being a foreign corporation, such a discount was an illegal act, and would have given the company no title to the bills; and the defendants, having full notice of such illegality, would stand in no better position.
*561 The statute (1 R. S. 712, .§ 3-6), and the act of 1837, chapter 20, with the cases cited, are, we think, inapplicable. The prohibition of the statute is now merely against a foreign corporation keeping an office for the purpose of receiving deposits, or discounting notes or bills, &c. We do not find in the case any testimony tending to show that an office was kept for the purpose. - The bills were transmitted by the plaintiffs to their collection agent, the Trust Company, for collection. The .company, .as the plaintiffs contend, did not discount them, but transferred them to others, to get money on them.
The court was right in this refusal.
The next branch of this second head of the plaintiffs is, the refusal to charge as requested.
Almost all the questions remaining in the case may be considered together under this head. They involve the consideration of the accuracy of the judge’s charge, of the exceptions taken to it, and of every point in which a charge was not made in accordance with the request to charge.
If the charge comprises a full statement of the law on every material point, and if the actual charge on each of such points is correct, it is a necessary conclusion that the request need not have been complied with.
The first objection to the charge is, for stating the rule to be that, though a man has such knowledge as will excite suspicion and lead to inquiry, yet if he make such inquiries as a man of ordinary prudence would do, and if the information received be such as would naturally be credited and remove suspicion, then he acts in good faith, and will acquire title, so far as it depends on a question of good faith.
It is obvious that the same general rule must apply as well to the case of a person’s supineness in making inquiry, when he is apprised of something to lead to it, as to the case of his reliance upon the information which an inquiry, once commenced, has obtained. In each case the question is, was it a neglect indicating bad faith, which made him omit entirely in the one instance, and omit to proceed fur-' ther in the other ?
*562 The Lord Chancellor of England has adverted to the rule now recognized as follows: “Imust not part with this case without expressing my entire concurrence in what has of late years fallen from judges of great eminence on the subject of constructive notice, namely, that it is highly inexpedient for courts of equity to extend the doctrine. Where a person has actual notice of a fact, there can be no danger of doing injustice if he is held to all the consequences of that which he knows to exist. But where he has not actual notice, he ought not to be treated as if he had notice, unless the circumstances are such as enable the court to say, not only that he might have acquired, but also that he ought to have acquired the notice with which it is sought to affect him; that'he would have acquired it, but for his gross negligence in the conduct of the business in question. The question, when it is sought to affect a purchaser with constructive notice, is not whether he had the means of obtaining, and might by prudent caution have obtained the knowledge in question, but whether the not obtaining it was an act of gross or culpable negligence,” (Per Lord Cranworth, in Ware v. Egmont, 31 En. L. and Eq. Rep. 89.)
The case of Jones v. Smith, cited by counsel, (1 Phillips’ Rep. 244, 1 Hare’s Rep. 43,) is a striking example of this general rule, applied by Lord Lyndhurst to the case of neglect in conducting an- inquiry which had been begun. The cases áre critically examined, from those which proceed upon the ground of what is termed “ willful blindness” to those in which a wary and prudent person would have inquired further ; yet the party, had acted bona fide, and only omitted to do what a wary and cautious person would have done.
But the opinions in the case of Frazer v. Western, especially that of Mr. Justice Bronson, in the Court of Appeals, should be noticed upon this subject. The case is to be found in 1 Barbour’s Ch. Rep. 220, and in Howard’s Appeal Cases, vol. 1, 448. The assistant Vice-Chanceller, Hoffman, had found the defendant not to be a purchaser for valuable *563 consideration, on the ground mainly that he had a trust deed in his possession, which showed it was a voluntary conveyance by a husband to a wife, and that the trustee was to convey on her request; and that an inquiry of the trustee would have led to the ascertainment of the fact that the grantor was utterly insolvent in May, 1830, and to inquire whether he was not insolvent in August, 1828, the date of the conveyance. (1 Barb. Ch. Rep., ut supra.) The language of Sir William Grant, was held pertinent:
“He was bound merely not to shut his eyes against the information which, without extraordinary neglect, he could not avoid receiving.”
The Chancellor reversed the decree, on the ground of Western being (particularly from the force of his answer) a purchaser for valuable consideration without notice of the fraud.
In the Court of .Appeals, Ch. Justice Jewett supported the Chancellor’s decree on the Chancellor’s ground.
Mr. Justice Bronson examined the case, and concurred with the assistant Vice-Chancellor in his views on this, as on the other points. His comments upon the principle of constructive notice, and the duty of prosecuting the means of information open to a party, and his criticism of authorities, is more elaborate than is usual with him. It is not to be questioned, that he supports a rule, under which much less would be deemed constructive notice than under that -of the late English authorities.
He held that Western could not be deemed a bona fide purchaser without notice. “No one could read the deed — especially no eminent counselor-at-law, like Mr. Western—without having his suspicions aroused that it was a device to defraud the creditors of the grantor.”
Ruggles and Gray concurred with Justice Bronson. Gar-diner and Jones are to be considered as concurring with Justice Jewett on this point. On various grounds, the decree of the Chancellor was affirmed by a vote of five to three.
I think, also, that a distinction should be made in favor of the currency and transmission of negotiable paper; *564 and that the rule of the English authorities I have noticed is peculiarly applicable to dealings in such paper. These acceptances are indorsed in blank by the cashier of the plaintiffs, sent to the proper officer of the Ohio Company, and indorsed by him in blank. The faith to be attributed to possession, as evidence of title, is greater in such cases than in others. The neglect to make inquiries must, therefore, he more decided and willful.
Goodman v. Simonds (20 How. U. S. Rep. 343) was a case of negotiable paper; and the instruction given to the jury by the court below was in the leading point substantially given by the judge on the trial in the present case. Under such instruction, the jury found for the defendant—the party upon the collateral security transferred for a personal debt of the holder—finding thus: “That the plaintiff knew of such facts as caused him to suspect, or would have caused one of ordinary prudence to suspect, that he (Sigerson, the depositor) had no interest in the bill, and no authority to use the same for his own benefit, and by ordinary diligence he could have ascertained these facts.” Such was the instruction.
The court repeats the doctrine laid down in Swift v. Tyson (16 Peters, 1), that a bona fide holder of a negotiable instrument, for valuable consideration, without notice of facts which impeach its validity between the antecedent parties, if he takes it under an indorsement made before it is due, holds the title unaffected by those facts, and may recover thereon, although, as between the antecedent parties, the transaction may be without any legal validity.
Next, it is declared that the word notice, as used in this proposition, must be understood in the same sense as knowledge; which is one of its usual and appropriate significations.
If the defect is on its face, it is matter of construction whether it conveyed notice, and must be determined as a matter of law.
Nothing less than proof of knowledge of external facts and circumstances which impair the title will suffice, and *565 meet the exigencies of a defence of notice. While the party is not bound to make inquiry, he must not willfully shut his eyes to the means of knowledge which he knows are at hand; that, whether equivalent to notice or not, would be plenary evidence of bad faith.
“ The mere want of care aud caution is not enough to defeat the party taking the paper.
“ The error was of great magnitude in an instruction, that any facts and circumstances which would excite the suspicion of a careful and prudent man would be sufficient to destroy the title. Gross negligence is nob of itself enough, although it may be evidence of bad faith. Bad faith is the criterion.”
It is not to be questioned, that the train of reasoning in the case of Pringle v. Phillips (5 Sandf. R. 157), in this court, is adverse to the propositions thus declared; and the leading cases were carefully examined. It was a case of replevin for goods. And in Williamson v. Brown (15 N. Y. R. 354), upon a question of title to real estate, similar doctrines, with respect to the duty to inquire upon information possessed of facts inducing inquiry, are sustained, as stated in Pringle v. Phillips.
The charge of the learned judge appears to me to be strictly within the rules of law as declared in the cases in our own State; indeed, to be as favorable to the plaintiff's as it well could be consistently with such rules. If the defendants knew that the acceptances were not the property of the Trust Company, they acquired no title, was one proposition submitted, and plainly correct. If they had notice of circumstances which should lead them to suspect they were not the property of the company, was another position; and was sufficiently just to the plaintiffs, and sound upon the cases noticed. If they had knowledge of circumstances creating suspicion, and leading a man of ordinary prudence to make inquiry, and they did inquire, and then the information was such as would naturally be credited, and remove suspicion, then they acted in good faith, was a third proposition equally correct.
*566 But if the law declared by the the Supreme Court of the United States could be deemed the imperative rule here, then the learned judge has given to the jury a rule far more favorable to the plaintiffs than that law would have warranted. We cannot grant a new trial for this. (4 Sandf. Rep. 67.)
The plaintiffs’ counsel, in his fifth point, insists that the jury should have been charged in accordance with the third, fourth, fifth and sixth requests made .by him. He objects also to a portion of the charge, which was not made the subject of an exception at the trial.
It seems to me that, so far as these requests are not substantially covered by the charge itself, they do not arise now in the case. They are negatived by the verdict of the jury, finding that the defendants took the bills for value, honestly believing them to be the property of the company.
It is scarcely necessary to say that the verdict of the jury cannot be set aside as being unwarranted by the testimony.
The subject of the seventh point of the plaintiffs, connected with the Statute of Ohio, was not noticed by the learned counsel of the plaintiffs, and no point was made by him respecting it.
The order denying a motion for a new trial must be affirmed with costs.
Bosworth, Ch. J.
—An indorsee of business paper, who is denied the character of a Iona fide holder, or of being a holder in good faith, merely because it was indorsed to him as security for the payment of a usurious loan, is denied it because he acquired his title under a contract declared by law to be void, a contract for the taking of usury, the taking of which is declared to be a misdemeanor, and punishable as such. In other words, the law does not regard him as a holder in good faith, and in the usual course of business, because he acquired his title under an illegal and prohibited contract, to which he was a party.
But if the usury law is repealed as to. contracts made *567 with a corporation, and if the taking of fourteen per cent, interest from a corporation is as lawful as taking seven per cent., then it would seem to follow that one who loans money in actual good faith to a corporation, on the security of negotiable paper, is not to lose his title on the fanciful construction that the contract is valid as between the corporation and person lending to it, but is void as between the latter and all third persons whose rights may be affected by the transaction, if treated as lawful and valid.
It was not intended that the act of 1850 (chapter 172) should result in the practical absurdity, that the contract with the corporation should be deemed void as previously1 but that the corporation should not be permitted to prove that fact as a defence.
Neither was it designed to make the contract valid as against the corporation, and at the same time leave it, as to the lender to the corporation, a prohibited contract in any respect.
By force of the act of 1850 (chapter 172), the lender to a corporation at more than seven per cent., who holds its obligation to repay the sum lent and the interest agreed upon, may recover judgment for such interest in the courts of this State, and collect the judgment by execution.
It is beyond the power of the corporation to prevent this result.
It seems to me absurd to say that the corporation may, within one year after the payment of such judgment, sue for, and recover from the lender, the excess of interest over seven per cent., (3 R. S. 5th ed. 72, § 3,) or that such lender can be indicted and punished by fine and imprisonment for collecting his judgment, (Id. 74, § 15,) a judgment to which he was entitled by law, and which the court, therefore, was bound to render and execute.
Inasmuch, therefore, as the act of 1850 (chapter 172) provides that a corporation cannot defend a suit brought against it, on the allegation that it is brought on a usurious contract, it in effect enacts that a lender to a corporation at more than seven per cent, may, in an action on such *568 contract, recover the sum lent and the interest agreed to be paid. Such an act, in effect, necessarily repeals all preexisting laws giving to the borrower a right to recover back the excess paid over seven per cent., or declaring the reception of over seven per cent, on such contracts a misdemeanor.
A law giving the right to enforce the contract and recover interest at the stipulated rate, by necessary implication repeals any and all laws making it unlawful to stipulate for and actually receive more than seven per cent.
This view of the import of the act is sustained not only by the emphatic and pertinent remarks made by several judges in Curtis v. Leavitt, 15 N. Y. 85, and by Pratt, J., in Southern Life Ins. and Trust Co. v. Packer et al., 17 N. Y. 52, to the effect that it is a partial repeal of the usury laws, but .also by the propositions actually decided. The statute was designed to establish a principle, a rule of law applicable to a class of contracts, and not an anomalous rule of practice.
I therefore conclude that the contract between the defendants and the Ohio Life Insurance and Trust Co. is as valid as if the loan had been made at seven per cent., and that the imputation to the defendants of not being 6ona fide holders, is no more predicable of a contract reserving fourteen, than of one reserving seven per cent, interest.
- The judgment pronounced in the Hungerford Bank v. The Potsdan and Wat. Railroad Co. (19 How. Pr. 36), does not necessarily involve the decision of any question adverse to the views I have stated.
It was considered as- settled law, prior to the passage of the act of 1850 (ch. 112), that the discount or purchase of an indorsed note, having no previous legal inception or validity, at a greater rate of interest than seven per cent., made the note void for usury. (Aeby v. Rapelye, 1 Hill, 9.) A statute which repeals the usury laws as to, or declares them inapplicable to the makers of negotiable paper, or to the contracts of a specified class of persons, would not affect the separate and independent contract of the indorser, or the contract of any person not included within the specified class.
*569 The contract of an accommodation indorser is his own contract alone, and not that of his principal. The separate contract of the accommodation indorser, or other surety, whether cotemporaneous with, or subsequent to, that made by his principal, may be void, as contravening the usury laws; while that of the principal is valid, as not reserving more than seven per cent.; or by force of some act, making it legal though a greater interest was received.
The securities taken by the defendants were valid, and obligatory upon the parties to them when received; and the 'question arises as to the right of the defendants to enforce them, if their title is established.
As to the power or authority of the borrowing corporation to make a valid pledge of the bills owned by the plaintiffs, to secure the payment to the defendants of the sums they lent, it is sufficient to say that the defendants’ title does not depend upon the fact of there being any actual authority from the plaintiffs to pledge. That question has no more pertinency now than if the loan had been made at seven per .cent.; or than it has where negotiable paper, lost or stolen, has been passed to persons claiming to be Iona fide holders. The defendants’ title depends upon the question, whether they are holders in actual good faith, for value paid before the maturity of the paper in qxiestion. The jury have found that they are such holders. They must be treated as being such holders, and having acquired a title valid, as against the plaintiffs; unless the law imputes to them the character of mala fide holders, solely because the loan they were taken to secure was made upon an agreement reserving fourteen per cent, interest. The act of 1850 (ch. 112), if the views already stated are correct, prevents any such result.
If the evidence, as to the rate of interest for which the defendants stipulated was rightly excluded, as I think it was, the jxidgment should be affirmed. The other exceptions taken I regard as untenable.
Order affirmed.